**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

In re:

Brenda Jo Musel,

    Debtor.

Case No. 20-42761

Chapter 7

**MEMORANDUM DECISION AND ORDER**

At Minneapolis, Minnesota, July 7, 2021.

This chapter 7 case came before the Court on the chapter 7 trustee's motion for turnover (ECF No. 10), along with the debtor's response thereto (ECF No. 14). A hearing was held on March 3, 2021. Appearances were as noted on the record. At the conclusion of the hearing, the Court granted the parties time to reach and file a stipulation of facts, with an evidentiary hearing as the alternative if the parties were unable to do so. The parties filed a stipulation on April 1, 2021 (ECF No. 19). On April 6, 2021, the Court entered its order setting deadline (ECF No. 20), ordering the trustee and the debtor to submit simultaneous, supplemental legal briefs by April 16, 2021. The parties submitted their briefs and the Court thereafter took the matter under advisement. It is now ready for resolution.

This is a core proceeding under 28 U.S.C. § 157(b)(2), and this Court has jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334. This memorandum decision is based on all the information available to the Court and constitutes the Court's findings of fact and conclusions of law under Fed. R. Bank. P. 7052, made applicable to this contested matter by Fed. R. Bankr. P. 9014(c).

For the reasons stated herein, the trustee's motion for turnover is **DENIED**.

**BACKGROUND**

The facts concerning this dispute are straightforward and undisputed, and are incorporated herein pursuant to the parties' stipulation of facts and exhibits (ECF No. 19). The debtor filed her chapter 7 bankruptcy case on December 8, 2020. She is a citizen of the Pokagon Band of Potawatomi Indians (which will be referred to herein as the "Pokagon Band" or "the Band"). Pursuant to the Federal Indian Gaming Regulatory Act of 1988, 25 U.S.C. §§ 2701, *et seq.* ("IGRA"), the Pokagon Band enacted a Gaming Revenue Allocation Plan ("RAP"). Under the RAP, the Pokagon Band's citizens receive an apportioned monthly payment of the Band's net gaming revenues on a per capita basis. Since the payments are tied to the net gaming revenues, their dollar amount varies from month to month.

On the record before the Court, the debtor has received monthly per capita payments from the Pokagon Band under the RAP since at least January 2019 (ECF No. 19, Ex. B). The parties agree that thus far in 2021, the debtor has received per capita payments of approximately $750 per month. The trustee seeks turnover of all per capita payments the debtor has received since filing, along with any and all future per capita payments the debtor receives from the Band.

In arguing that the per capita payments are not property of the estate, the debtor cites to the following language in the RAP: "[n]othing in this Code shall be construed to give any person a vested property right or interest in Band gaming revenues. All Band gaming revenues shall be held by the Band until disbursed pursuant to Band law and this Code." The debtor argues that the per capita payments should be equated with employee bonuses, granted at the discretion of the employer.

The trustee disagrees, arguing that the per capita payments the debtor has received from the Pokagon Band during the pendency of this case – along with any future per capita payments

2

the debtor receives from the Band – should be considered property of the estate and turned over to the trustee. The trustee further clarifies that she is not arguing the debtor has a vested interest in tribal gaming revenues, but rather that the debtor has a right to receive per capita payments from the tribe when they are paid out; the trustee argues this right to payment – in itself – is an interest in property and should be included in the debtor's bankruptcy estate. The trustee equates the right to payment to an interest in a business entity, which comes with a right to payment of distributions – if, indeed, distributions are ever made.

## DISCUSSION

### I. There is little case law precedent or guidance on the issues before the Court, and the available decisions are neither conclusive nor binding on this Court.

To the Court's knowledge, there exist fewer than a dozen reported decisions addressing the issue of how the kinds of per capita tribal payments at issue here should be treated in a bankruptcy case – and two of those involve the same debtors. In re McDonald, 353 B.R. 287 (Bankr. D. Kan. 2006); In re McDonald, 519 B.R. 324 (Bankr. D. Kan. 2014). Of the reported cases on the issue, the majority involve just two tribes – the Potawatomi and the Ho-Chunk Nation – in two states – Kansas and Wisconsin. One case in the minority is from the District of Minnesota. In re Barth, 485 B.R. 919 (Bankr. D. Minn. 2013). None of the cases provides more than persuasive authority to this Court, and without any definitive appellate guidance on these issues, courts have taken widely varying approaches when addressing these issues.

The core issue underlying each of these cases was whether the per capita payments should be classified as property interests, which would necessarily mean they were included in the bankruptcy estate under 11 U.S.C. § 541(a)(1). In the available decisions, the crux of this determination has been whether the relevant tribal nation's ordinance has addressed the issue of

3

per capita payments in the context of property rights, and generally, how a court has or has not considered that language in characterizing the per capita payments.

Some courts view the right to receive the payments to be the "property" at issue, and based on tribal law or state law, they generally find that the right is property of the estate, regardless of its value. See, e.g. In re Howley, 446 B.R. 506 (Bankr. D. Kan. 2011) (applying state law and the fact that "The Ordinance has no provision stating that the funds to be used for payments retain their character as property of the tribe until actually disbursed" in finding the right to payment was property of the estate); In re Kedrowski, 284 B.R. 439 (Bankr. W.D. Wis. 2002) (applying state law in finding the right to payment was property of the estate); Johnson v. Cottonport Bank, 259 B.R. 125 (W.D. La. 2000) (finding that the debtor's right to receive the payments was "freely transferable," but could not be devised to another since payments only last for the life of the tribal member). See also In re McDonald, 353 B.R. 287 (Bankr. D. Kan. 2006) (finding that the debtors stipulated they had a property interest in the right to distributions); In re Hutchinson, 354 B.R. 523 (Bankr. D. Kan. 2006) (finding that the debtor did not contest that the right to receive future payments constituted property of the estate); and In re McDonald, 519 B.R. 324 (Bankr. D. Kan. 2014) (following previous McDonald case). These cases tend to align with the trustee's argument that per capita distributions are akin to business interests. For example, the court in In re Kedrowski stated:

> It is true that the casino business is a "risky enterprise." [] However, it is a *business* . . . As such, tribal per capita distributions are far more conceptually akin to an interest in a business enterprise than they are a gift, a license, or some form of public assistance.
>
> Someone who owns stock in a company, or holds a limited partnership interest in a business, may never receive a distribution on that interest. The business may encounter a poor economic climate, may find expenses outpacing revenues, and may even fail. But should the company ever issue a dividend, all stockholders receive an appropriate amount in relation to their interest. Clearly, those who hold

4

a "right" to receive payment from the operation of a business hold some sort of intangible property right under [state] law.

In re Kedrowski, 284 B.R. 439, 447 (emphasis in original) (quoting Maxam v. Lower Sioux Indian Cmty. of Minnesota, d/b/a Jackpot Junction Casino, 829 F.Supp. 277 (D. Minn. 1993)).

Other courts have opted to consider a different question: whether the payments would provide only inconsequential value and benefit to the estate under 11 U.S.C. § 542(a). See, e.g., In re Meier, 2013 WL 6135085 (Bankr. E.D.N.C. Nov. 21, 2013) (finding that even if the payments were property of the estate, they were not subject to turnover because they were non-transferable and therefore of inconsequential value to the estate); In re Brown, 2006 WL 6810938 (B.A.P. 9th Cir. Sept. 28, 2006) (finding that although the present and future per capita payments were property of the estate under the Kedrowski logic, vacating and remanding in part was necessary for further factfinding because "an interest in future distributions is only of value to the estate if it can be assigned, sold or reached for the enforcement of judgments").

Still other courts consider the payments themselves to be the property in question; these courts focus on the status of the future payments as contingent interests, since the tribes must opt to disburse them. See, e.g., In re Fess, 408 B.R. 793 (Bankr. W.D. Wis. 2009). These courts generally find that the future payments are not property of the estate, focusing on the importance of sovereignty and the language included in the relevant tribal nation's code. Id. For example, the court in the Minnesota bankruptcy court case of In re Barth primarily considered the language of the relevant Gaming Revenue Allocation Ordinance, which stated in relevant part:

> The per capita payments made under this Ordinance are a personal benefit to the Community Members who qualify. The per capita payments are periodic payments, not a property right. The right to receive [] per capita payments does not accrue or vest until the Community actually makes a payment to Community Members who qualify. Additionally, no benefit, right or interest of any Community Member under his (sic) Ordinance, including per capita payments, shall be subject to anticipation, alienation, sale, transfer, assignment pledge,

5

>  encumbrance or charge, seizure, attachment or other legal, equitable, or other process.

Barth, 485 B.R. at 921. The Barth court found that the Lower Sioux Indian Community, as a sovereign nation, had just as much authority to define property interests within its jurisdiction as did the state. Id. The court thus found that the relevant and defining language included in the tribe's Ordinance prevented the per capita distributions from becoming property of the estate. Id.

Therefore, the nature and extent of a right to payment – as established in a tribe's relevant ordinance language – can also be determinative of whether a right to payment should be included in the estate. See, e.g., In re Fess, 408 B.R. 793 (Bankr. W.D. Wis. 2009) (finding that because the debtor "only had an expectancy" to the per capita payments based on the compact language, "no legal rights attached" to make the payments property of the estate because § 541(a)(1) was not broad enough to encompass a mere expectancy in estate property); In re Howley, 446 B.R. 506 (Bankr. D. Kan. 2011) (declining to follow Fess because the relevant "Tribal Ordinance does not have provisions similar to those of the Ho-Chunk Nation Code which controlled the outcome in Fess"); see generally In re DeCora, 396 B.R. 222 (Bankr. W.D. Wis. 2008) (finding that a lien creditor's claim for payments on future per capita gaming payments was subordinated by tribal law and language, and "federal preemption and tribal sovereignty prevent state law from altering this result").

## II. Property of the estate is generally defined by reference to state law – but in this instance, federal law grants tribes the authority to define its contours.

Property interests in a debtor's bankruptcy estate are defined broadly and include "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Property interests can be tangible goods or "general intangibles," defined by the Uniform Commercial Code as:

> . . . any personal property, including things in action, other than accounts, chattel paper, commercial tort claims, deposit accounts, documents, goods, instruments, investment property, letter of credit rights, letters of credit, money, and oil, gas, or other minerals before extraction. The term includes payment intangibles and software.

Uniform Commercial Code § 9-102(42). Minnesota courts have found that general intangibles can include assets like a general partner's interest in a partnership or a membership interest in a limited liability company. Trapp v. Hancuh, 530 N.W.2d 879 (Minn. App. 1995); Kagel v. Brackey, 2016 Minn. App. Unpub. LEXIS 89 (Minn. Ct. App. Jan. 25, 2016).

General intangibles may not, however, include property to which a debtor has only "a bare expectation and hope of receiving" at the time of filing, such as a bonus payment. In re Gonzalez, 559 B.R. 326, 331 (Bankr. E.D.N.Y. 2016). Where an employer has the discretion not to make a contingent payment such as a bonus payment, a debtor's expectation of that payment is not enough to bring that payment into the estate, even if: (1) the bonus was based on pre-petition employment; (2) the bonus program existed on the petition date; and (3) the debtor was eligible for the bonus on the date of the petition because prior to filing, the debtor completed all tasks in the debtor's control toward obtaining an award under the bonus program(s). In re Klein-Swanson, 488 B.R. 628, 633-34 (B.A.P. 8th Cir. 2013); In re Simpson, 2018 Bankr. LEXIS 4102 (Bankr. W.D. Ark. Sep. 10, 2018). The Klein-Swanson court distinguished this kind of employer-discretion bonus program from a profit-sharing program, under which an employee is contractually entitled to a payout from the employer as long as certain conditions are met. Klein-Swanson, 488 B.R. at 636-37 (citing Booth v. Vaughan (In re Booth), 260 B.R. 281 (B.A.P. 6th Cir. 2001)).

While federal law controls whether a property interest is property of a debtor's bankruptcy estate, a property interest itself is created and defined by state law – except where federal law provides otherwise and "requires a different result." Klein-Swanson, 488 B.R. at 636-37 (citing

7

Butner v. United States, 440 U.S. 48, 55 (1979) and Reagan v. Regions Bank (In re Wetzel), 649 F.3d 831, 834-35 (8th Cir. 2011)). For the property definitions to be used here, federal law "requires a different result" by delegating decision-making authority and sovereignty to tribal nations.

The United States federal government recognizes tribal nations as sovereign nations, subject only to the authority of the federal government except where Congress expressly provides that state laws apply. See, e.g., California v. Cabazon Band of Mission Indians, 480 U.S. 202 (1987). IGRA is one example of a situation in which Congress invited state oversight over tribal activities; under IGRA, Congress permits states to regulate certain specific aspects of gaming activities offered on tribal reservations, and a tribe that wishes to offer casino gaming on its lands must have a compact with the relevant state regarding such gaming. See "The Fate of Tribal Per Capita Payments in Bankruptcy Cases," 36-4 ABIJ 46; 25 U.S.C. §§ 2710(d)(1), 2703.

Through IGRA, Congress also mandates that tribes wishing to engage in gaming on their lands must adopt an ordinance or resolution stating that net revenues from the gaming activity will be used for specific purposes, including providing for the general welfare of the tribe and its members. 25 U.S.C. §§ 2710(b)(1), (2). One method a tribe can use to meet this requirement is making per capita payments to members. § 2710(b)(3). As long as the ordinance or resolution meets the basic requirements outlined in the federal statute – including any other parameters concerning property definitions that the tribe deems relevant for inclusion – that ordinance "shall" be approved. § 2710(b)(2).

In the present case, the Pokagon Band's RAP, as shown on the record (ECF No. 19, Ex. A), states that after funds needed for the benefit of the Band as a whole are deducted from net revenues, "the Band shall deposit fifty-seven per cent (57%) of remaining net gaming revenues in

a Per Capita Payment Account." ECF No. 19, Ex. A, Section 3.D. 1-2. It further provides for monthly per capita payments which "shall be used to advance the current and long-term personal health, safety and welfare of Band members by providing to members a periodic payment of money from the net gaming revenues . . . " and that payments "shall be made monthly . . ." ECF No. 19, Ex. A, Section 3.D. 1-2; Section 4. The RAP further states that "Nothing contained in this Code shall be construed to give any person a vested property right or interest in Band gaming revenues. All Band gaming revenues shall be held by the Band until disbursed pursuant to Band law and this Code." ECF No. 19, Ex. A, Section 17.

The Pokagon Band, when it enacted its RAP in October 2005, complied with IGRA; the RAP's legislative history shows that the United States Secretary of the Interior approved the RAP consistently and repeatedly thereafter, beginning in 2006 and most recently in 2018. ECF No. 19, Ex. A, page 10.

The core issue before the Court is whether the per capita payments under the Band's RAP are property of the bankruptcy estate under § 541(a). As already discussed, absent definitive appellate guidance, the few courts that have addressed the property status of these kinds of per capita payments have varied widely in their approaches – including in determining what weight should be given a sovereign tribal nation's definition of the property status of the payments. However, the federal statute leaves no room for interpretation; again, as long as a tribe's ordinance meets IGRA's basic requirements – even where it also exercises its tribal authority by including other language – the ordinance *must* be approved under the statute. 25 U.S.C. § 2710(b)(2). In other words, although IGRA permits state regulation of certain tribal activities related to gaming by requiring tribes to meet certain requirements, once those requirements are met, tribal authority governs.

Crucially, "when the property in question falls outside of state commercial codes by virtue of the federal interest or the nature of the property, federal law provides the rule of decision. In such instances, if a federal statute speaks to the issue directly, the court will look no further." Airadigm Commc'ns, Inc. v. Federal Commc'ns Comm'n (In re Airadigm Commc'ns, Inc.), 519 F.3d 640, 650 (7th Cir. 2008). Additionally:

> The tribal interest in regulating distribution of tribal assets to tribal members is a type of internal regulation within tribal sovereignty upon which state law is usually not permitted to intrude . . . assessing whether state law can alter tribal law requires balancing of the federal and tribal interests in tribal sovereignty and self-governance with state interest in enforcing its laws. However, the Nation's interest in controlling the distribution of its revenue far outweighs [the state's] interest in enforcing its commercial code. *The right of the Nation to distribute its own assets as it sees fit is central to self-governance; [the state's] interest in uniform treatment of creditors is minimal by comparison.*

Ho-Cak Fed. V. Herrell (In re DeCora), 396 B.R. 222, 225 (W.D. Wis. 2008) (emphasis added). Indeed, as the Minnesota bankruptcy court noted in In re Barth:

> the question [is] whether the [tribe], a sovereign nation, has the authority to limit the definition of property right with respect to tribal property to exclude the per capita payments of tribal funds paid by the tribe to qualified members. [The state] clearly has the authority to define property rights with respect to property within its jurisdiction and which is subject to [] state law. The plaintiffs offer no credible reason why the [tribal] nation does not enjoy similar authority with respect to property within its jurisdiction and which is subject to its law.

In re Barth, 485 B.R. 919, 922 (Bankr. D. Minn. 2013). Tribal sovereignty, therefore, is a central consideration in the issues before the Court, not because the debtor, as a tribal member, can apply her tribe's sovereignty to herself in her individual capacity – she cannot – but rather because the tribe's sovereignty gives it the authority to define the parameters of property rights in certain circumstances, including this one.

The Pokagon Band thus met, and continues to meet, IGRA's requirements – it received approval from the United States Secretary of the Interior for its RAP and fundamentally has the

authority to define the property status of the per capita payments. In this instance, federal law does not create the property right itself, but it does specifically authorize tribes to create and distribute per capita distributions. Therefore, although the Bankruptcy Code controls whether a property interest is property of the estate, once it is established as a property interest, in this instance it is the tribe's RAP language that creates and defines whether a property interest exists at all. The question this Court must answer, then, is a straightforward one: how did the Pokagon Band define the parameters of any property rights relating to the per capita payments?

The language in Section 17 of the Band's RAP is clear: "Nothing contained in this Code shall be construed to give any person a vested property right or interest in Band gaming revenues. All Band gaming revenues shall be held by the Band until disbursed pursuant to Band law and this Code." ECF No. 19, Ex. A. The language speaks for itself: until payment occurs, Band members do not have a vested right or interest in the gaming revenues. Although – as the trustee points out – the Pokagon Band's RAP language is not as expansive as the language in agreements considered in other cases, including Barth, 485 B.R. at 921-22, it does enough to definitively define the contours of the property right; "less expansive" language does not necessarily equate to "less effective" language.

The trustee argues that the Band's RAP gives the debtor a right to receive payments when the Band opts to disburse them, and that the right to payment – in itself – is a property interest that should be included in the estate under § 541(a). Following the detailed findings in Kedrowski, 284 B.R. at 447, the trustee argues that the "right" created under the Band's RAP is a "general intangible" property interest, akin to an interest in a business or partnership.

The Court disagrees. Notably, the Kedrowski court based its conclusions mainly on the relevant state law, which does not apply in the face of tribal sovereignty – particularly where that

11

sovereignty is explicitly and federally granted. Additionally, business or partnership interests can be sold, transferred, or otherwise liquidated or valued. This differs dramatically from the kinds of per capita payments at issue here, which are designed to be paid to a specific person based on personal status, are non-transferable, and allegedly create – at most – a "right to payment." When seeking to classify this "right" as property of the bankruptcy estate, trustees have generally not attempted to transfer or liquidate the asset as they would a business interest, but rather have sought turnover of all future payments that may result from that right, in perpetuity.

Further, a mere expectancy of payment does not equate to a right to payment. As was already discussed in the context of bonus payments, even if an individual has taken active steps to meet metrics that would qualify that individual for a particular payment, any contingent expectancy that individual has to receive a payment is not a "right to payment." Rather, it is a mere expectancy to which no legal rights attach, and which is not included in the bankruptcy estate. See, e.g., Fess, 408 B.R. at 799.

While the trustee parses apart the ideas of (1) a vested property right in the Band's gaming revenues and (2) a "right to payment," this is a distinction without a difference. If the right to payment is itself the property right, then that right is not contingent; it exists – or, in other words, is vested – in the individual who holds that right to payment. The trustee argues that this means it must be included in the bankruptcy estate. However, federal law provides that tribal law applies, and the Pokagon Band's RAP, by its explicit language, prevents the creation of a vested property right. Therefore, the concept of a "right to payment" being a property interest in itself might apply in some situations, but it does not apply here given the plain language of the relevant law. Where the property right does not exist to begin with, it may not be included in the bankruptcy estate under § 541.

Ultimately, federal law specifically delegates to tribes the right to define the extent of property interests with respect to gaming revenue per capita payments. Therefore, the only law that matters in determining those interests is the language contained in the tribe's fully compliant and federally-approved Revenue Allocation Plan. In this case, the RAP specifically states that it does not create any vested property rights or interests, so – quite simply – it does not.[1]

### III. The per capita payments are also not property of the estate in policy, logic, or equity.

The tribe's definition of property within its own jurisdiction should be where this inquiry ends. As two Harvard professors wrote in a symposium paper nearly two decades ago:

> The United States was not formed merely by the Constitution, but by the treaties entered into with Indian nations. Those treaties form the original framework of American government and recognize both tribes' sovereignty and retained property rights. U.S. law respects both property rights and contract rights, as well as international treaties. To fail to honor treaties with Indian nations would take from them property rights recognized by those treaties, constitute breaches of contract, and violate the constitutional structure of American government. *In asserting sovereignty, Indian nations are not seeking special rights. They are asking that the U.S. [] grant the same respect to its commitments to Indian nations that it grants to its commitments made to the other sovereigns that it subsumed upon its formation and expansion (i.e., the states) and to the other sovereigns with whom it has entered into treaties.*

Joseph P. Kalt and Joseph William Singer, *Myths and Realities of Tribal Sovereignty: The Law and Economics of Indian Self-Rule*, 2004-03 JOINT OCCASIONAL PAPERS ON NATIVE AFFAIRS 7 (emphasis added).

However, the history of case law on this issue – and concerning tribal issues more generally in this country – shows that courts have routinely favored whatever law was not created by

---

[1] Further, to the extent that the RAP's language could be interpreted any other way, "the Supreme Court has admonished courts to interpret Indian treaties and applicable federal statutes by resolving any doubtful expressions in favor of the Indians' sovereignty." In re Brown, 2006 Bankr. LEXIS 4902 at *35 (citing McClanahan v. State Tax Comm'n of Ariz, 411 U.S. 164, 172-74 (1973)).

Indigenous Peoples; for example, bankruptcy courts have largely favored state property definitions of per capita payments over those legitimately created and defined through tribal sovereignty and authority. In favoring state law, however, courts have not only ignored the rights and authority of Indigenous Peoples, but have also, by proximity, flouted the underlying premises of the federal statutes that grant that authority. Therefore, it is unfortunate, but abundantly clear, that this inquiry cannot end, as it should, with the Pokagon Band's definition of the property interest parameters of the per capita payments. The Court will thus engage in a further analysis of why the per capita payments are not property of the bankruptcy estate, be it based on policy, logic, or equity.

First, finding the per capita payments to be property of the estate contradicts Congress's specific mandate in IGRA. The language of that statute states that net gaming revenues must be used for only specifically delineated purposes, including: funding tribal government operations or programs, providing for the general welfare of the tribe and its members, promoting tribal economic development, donating to charitable organizations, or helping fund operations of local government agencies. 25 U.S.C. § 2710(b)(2)(B). Ordering that the per capita payments must be paid to a tribal member's creditors would thus directly conflict with a federal mandate regarding what purposes those funds can serve. Similarly, finding that the payments should be paid first to the debtor and then turned over to the trustee as a "workaround," as many courts have done when considering these issues, would also run contrary to the plain meaning and intent of the federal statute.

Another issue that would be raised by including the per capita "right to payment" as property of the estate is that doing so would require a debtor's case to remain open indefinitely, and potentially in perpetuity. Indeed, in In re McDonald, the court ordered the debtors to "turn over all future per capita distributions . . . until all claims and expenses of this estate are paid, or

further order of the Court." 353 B.R. at 295. Taken to its logical – or, perhaps, illogical – conclusion, a standard chapter 7 case under this kind of order could remain open for years or even decades. In the meantime, the debtor would be required to continue to engage with the bankruptcy court and the chapter 7 trustee long after receiving a discharge, and could not transfer, sell, or otherwise dispose of this obligation, since the payments could still be paid only to that specific qualifying individual.

This kind of structure creates what is in essence an involuntary chapter 13 plan payment bankruptcy case. Involuntary chapter 13 cases are not permitted under the Bankruptcy Code, 11 U.S.C. § 303(a), and the idea raises many problems and concerns. Although the Court declines to express an opinion on this issue, some commentators have even argued that because chapter 13 cases are wage-earner plans that require debtors to essentially work for their creditors for a period of time, forcing an individual to participate in a chapter 13-style repayment plan could violate the 13th Amendment's prohibition of involuntary servitude. See Margaret Howard, Bankruptcy Bondage, 2009 U. Ill. L. Rev. 191. Certainly, requiring ongoing payments for an indefinite period of time conflicts in dramatic fashion with the Bankruptcy Code's core principle of granting a debtor a "fresh start" upon discharge. In fact, requiring assignment of per capita payments to the case trustee on an ongoing and indefinite basis would effectively destroy the discharge concept altogether, despite the Code's requirement that a debtor "shall" be granted a discharge absent an exception to discharge action brought under 11 U.S.C. §§ 727 or 523.[2]

---

[2] The Court notes that these concerns may be even more prevalent in the present case, where – despite the contingent nature of the per capita payments – the debtor had no other source of income when she filed her bankruptcy case. While that is not a determining factor in the Court's decision, it is an excellent example of the significant concerns raised by involuntarily dispossessing a debtor from receiving any future income from a specific source.

15

Further, a standard chapter 13 has a specific time limit enumerated in the Bankruptcy Code,[3] whereas this kind of "involuntary and in perpetuity" payment plan for the per capita distributions could easily conceivably continue for the rest of a debtor's life. Even a debtor's death could cause issues; procedurally, how does a trustee – or a court clerk's office, for that matter – close a case when a court has ordered that all creditors must be paid in full, but no payments are available? The same issue would arise if the tribe simply opts to stop making payments. The tribe could legitimately discontinue payments by removing the tribal member from the list of members eligible for the per capita payments or by refusing to make payments in accordance with its own sovereign law, or in compliance with the language of IGRA.

On the other end of the spectrum, what happens if the payments do continue, and when – likely a number of years after the order was issued – all creditors are fully and finally paid? The right to payment could not simply revert back to the debtor, since it had been determined to be property of the estate. Could the trustee (or, more likely, a successor trustee appointed to continue facilitating the ongoing payments over the course of many years) suddenly abandon it, after it had been a valuable asset of the estate for many years?[4]

Put simply, to include this kind of non-transferable and unsellable payment as property of the estate would require courts to leave cases open indefinitely; it would also dramatically delay and complicate administration of chapter 7 cases. This is at odds with the Bankruptcy Code itself, which requires a trustee to close a bankruptcy estate as "expeditiously as is compatible with the best interests of parties in interest." 11 U.S.C. § 704(a)(1). As the United States Trustee Program – which oversees the administration of bankruptcy cases and is responsible for establishing and

---

[3] See 11 U.S.C. § 1325(b)(4)(i)-(ii) ("the 'applicable commitment period' shall be 3 years or not less than 5 years").
[4] ". . . in a liquidation bankruptcy, if the court were to allow turnover, the debtor would lose her right to future payments upon satisfaction of the debt." In re Meier, 2013 Bankr. LEXIS 4928 at *15.

16

supervising a panel of chapter 7 trustees under 11 U.S.C. § 586(a)(1) – states in its handbook for chapter 7 panel trustees:

> Section 704(a)(1) provides that a trustee shall close an estate as expeditiously as is compatible with the best interests of the estate. Delays in case closure diminish the return to creditors, undermine the creditors' and public's confidence in the bankruptcy system, increase the trustee's exposure to liability, [and] raise the costs of administration . . . Delays also give rise to public criticism of the bankruptcy process.

United States Trustee Program, Handbook for Chapter 7 Panel Trustees, Effective October 1, 2012, p. 54.

Ultimately, to find that all future income from a given source belongs to the debtor's creditors for an indeterminate amount of future time is unconscionable in the context of the underlying tenets of the Bankruptcy Code.

## CONCLUSION

The Pokagon Band followed all of the requirements outlined in IGRA – a federal statute – to achieve federal approval for its Gaming Revenue Allocation Plan. Once that RAP was approved, the Band's sovereignty ensured that it became the sole and exclusive authority for creating and defining property rights for payments it authorized. The RAP's plain language prevented the creation of any vested property right or interest, and any intangible right to payment was unique to the individual tribal member. As a consequence, the debtor had no property interests that would be considered property of the estate under § 541(a). Additionally, even outside of the Pokagon Band's sovereign authority to create and define property rights, the per capita payments are not property of the estate in policy, logic, or equity.

17

Accordingly, **IT IS HEREBY ORDERED**:

1. The chapter 7 trustee's motion for turnover is **DENIED**.

2. The debtor is not required to turn over payments made to her by the Pokagon Band during the pendency of this case, nor is she required to turn over any future per capita payments she receives from the Pokagon Band.

Dated: July 7, 2021

*/e/ Michael E. Ridgway*

Michael E. Ridgway
Chief United States Bankruptcy Judge

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on 07/07/2021
Lori Vosejpka, Clerk, by MJS